### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNAMARIA RESTREPO, individually and on behalf of others similarly situated, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| BETHPAGE FEDERAL CREDIT UNION and DOES 1 through 100, | : |
| | : |
| | : |
| Defendants. | : |

---

### CLASS ACTION COMPLAINT

---

Plaintiff, Annamaria Restrepo, by her attorneys, brings this class and representative action against Defendant(s), Bethpage Federal Credit Union and DOES 1 through 100 (collectively "Bethpage" or "Defendant").

### <u>NATURE OF THE ACTION</u>

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff's or her counsel's personal knowledge, as well as Plaintiff's or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all other persons similarly situated, and in her capacity as a private attorney general on behalf of the members of the general public. Bethpage wrongfully charged Plaintiff and the Class Members fees related to their checking

#11771653.1

accounts.

3.     This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, Bethpage's policy and practice to maximize the fees it imposes on members.  The conduct has the common denominator of breaching its members' contracts and violating laws so as to maximize Bethpage's fee income, including but not limited to, imposing more than one NSF fee, or an NSF fee followed by overdraft fee, on the same electronic item or check;  and, charging fees which were neither disclosed nor authorized by the Account Contract or Fee Schedule, or not in accordance with the contracts' terms. The charging of such fees breaches Bethpage's contracts with its members, who include Plaintiff and the members of the Class, and also violates federal law.

## PARTIES

4.     Plaintiff Annamaria Restrepo, is a resident of Old Brookville, Nassau County, New York, and is a former member of Bethpage.

5.     Based on information and belief Bethpage is and has been a federally chartered credit union with its headquarters located in Bethpage, Nassau County, New York.  Bethpage has assets of more than $9.2 billion, and over 405,000 members in numerous states, including New York. It is a "financial institution" within the meaning of Regulation E, 12 C.F.R. § 1005.2(i).

6.     Defendants DOES 1 through 100 include agents, partners, joint ventures, subsidiaries and/or affiliates of Bethpage and, upon information and belief, also own and/or operate Bethpage branch locations.  Each of defendants DOES 1 through 100 is a "financial institution" within the meaning of Regulation E, 12 C.F.R. § 1005.2(i).  As used herein, where appropriate, the term "Bethpage" is also inclusive of Defendants DOES 1 through 100.

7.     Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

#11771653.1

8.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

9.     At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

10.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

11.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

12.     This Court has subject matter jurisdiction over this case, among other reasons, pursuant to 28 U.S.C. § 1331 and § 1332(d).

13.     Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b)(1), because Defendant is a resident of this District.

## FACTUAL ALLEGATIONS

14.     Bethpage offers its consumer banking customers a checking account.  One of the features of a Bethpage checking account is a debit card, which can be used for a variety of

3

transactions including the purchasing of goods and services. In addition to receiving a debit card, other features of a Bethpage checking account include the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and other types of transactions that debit from a checking account.

15.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Bethpage assesses what it calls " "Uncollected Funds Charge External Withdrawal (Paid)"; "Uncollected Funds Charge External Withdrawal (Returned)", "Insufficient Funds Charge External Withdrawal (Paid)"; "Insufficient Funds Charge External Withdrawal (Returned)"; "Insufficient Funds Charge CK (Paid)"; "Insufficient Funds Charge CK (Returned)"; "Overdraw Protection Withdraw"; OD Protection Tran Fee"; and, "POS Courtesy Pay Usage Fees" fees. As alleged further below, these fees either were not at all permitted to be charged by any Bethpage contract during the class periods, or were charged in breach of the contracts, or were charged without mention in the contracts, or without predicate compliance with law.

16.     Overdraft fees and Insufficient Funds fees ("NSF fees") constitute the primary fee generators for banks and credit unions. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. While credit unions portray themselves to customers as more overdraft and fee friendly than banks, a 2015 study conducted by Moebs Services confirmed that the median overdraft fees charged by credit unions are not statistically significantly less than the median overdraft fees charged by banks. For credit unions such as Bethpage, overdraft fees and NSF fees are a major source of revenue and a profit center.

17.     Since 2000, the average dollar amount of a checking account transaction has become much lower because customers, and especially younger customers, use debit cards instead of cash or credits cards for everyday purchases. That has translated to the average amount of overdraft transactions are lower than in 2000. However, while the average overdraft transaction is substantially lower and provides much less risk and exposure to the bank, the

4

average cost of overdraft fees per transaction has gone up from $15 in 2000 to $29 in 2018.

18.     The high cost of an overdraft fee is also usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id*. at p. 10).

19.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id*. at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id*. at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id*. at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id*. at p. 3).

20.     As a result of banks and credit unions taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The rulings of these cases have predominantly fallen in favor of consumers, forcing the banks and credit unions to repay their customers significant amounts of wrongfully collected overdraft fees.

21.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule")).  On information

#11771653.1

and belief, Bethpage calls its Regulation E program "Courtesy Pay."

22.    To qualify as affirmative consent for the Regulation E program, the Opt-In Contract must include, but is not limited, to the following:

- The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft, and the maximum number of fees that can be assessed on any given day (if there is no maximum, that fact must be stated);

- The financial institution must state whether alternatives, such as linking the checking account to a secondary account or line of credit, are available;

- The opt-in consent must be obtained separately from other consents and acknowledgements;

- The consent cannot serve any purpose other than opting into the overdraft program;

- The consent cannot be a pre-selected checked box;

- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

23.    If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, including fulfilling each of the above requirements, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.  On information and belief, although formal discovery will be required to confirm this, Bethpage did not fulfill these Regulation E prerequisites. The requirements which it did not fulfill, on information and belief, include, *inter alia*, 1. covering payment, for a fee, of checks and ACH transactions which exceeded the balance in the account for those members who opted into Bethpage's Regulation E Courtesy Pay program but not for those members who did not opt in, and, 2. in its actual Courtesy Pay Contract document, failing to even remotely correctly describe, at least until February 11, 2020, the program pursuant to

6

which Bethpage actually assessed these overdraft fees.   Discovery will be necessary to confirm

whether Plaintiff had opted in to the Regulation E program with Bethpage, and if so, this

Complaint will be amended to add further allegations about the additional violations and

damages arising from Defendant's violations of the Regulation E program.

24.     Bethpage entered into a written contract with Plaintiff and the other Class

Members entitled "Membership Account Information" and listed as effective October 20, 2017

("Operative Account Contract").

25.     Bethpage  had an improper practice of charging multiple NSF fees for the same

electronic item at least while its Fee Schedule dated December 2013 ("Operative Fee Schedule")

was effective, up to the date its new fee schedule dated October 2019 ("New Fee Schedule")

became effective. Bethpage charged a $30 fee during the class periods when an electronic item

was first processed for payment and Bethpage determined that there supposedly was not enough

money in the account to cover the item (a practice that on information and belief uses the wrong

"balance" to make the determination as described above).  Bethpage then charged an *additional*

NSF fee if the same item was presented for processing again, even though the account holder

took no action to resubmit the transaction for payment. But there was no authority in the

Operative Account Contract to charge more than one NSF fee for the same item, which states the

following about these fees:

> If you do not have enough money in your Available Balance at the time an ACH payment
> is posted to your account, there will be an overdraft.  If we pay the ACH, you will be
> charged **a** Courtesy Pay **fee**.  If we decline to pay **it**, then it will be returned unpaid and
> you will be charged **a** non-sufficient funds (NSF) **fee**. – Checks – The checks you wrote
> are also presented to us for processing in batches.  If you do not have enough money in
> your Available Balance at the time a check is posted to your account, then there will be
> **an** overdraft.  Again, if we pay the check anyway, then you will be charged **a** Courtesy
> Pay **fee**.  If we decline to pay **it**, then **it** will be returned unpaid and you will be charged **a**
> non-sufficient funds (NSF) **fee**.

(Emphasis added.)

26.     As can be seen, the Operative Account Contract is written in the singular

#11771653.1

throughout.  It states "**a** non-sufficient funds **fee**" will be charged.  It states, "If we decline to pay

**it**."  "It" is the "ACH item" or the "check."  Bethpage's reference to the fee is singular in its use

of the word "**a**" and also singular in its use of the word "**fee**."  It does not say "**multiple**" instead

of saying "**a**," and it does not say "**fees**" instead of saying "**fee**." The wording is all in the

singular. Further, nowhere does Bethpage's Operative Account Contract state that multiple

presentments of the same "item" allow it to charge multiple fees for that same "item."  Nowhere

does the Operative Account Contract state that the NSF fee would be "for each presentment of

the "item" or "per presentment of the item."  It does not even have an adjective such as "debit" in

front of the word "transaction" to arguably create an ambiguity on this issue.

27.    The Fee Schedule in effect during the class period makes additionally clear that

the charge allowed for an NSF fee was "per item" and not "per each presentment of the item":

| | |
|---|---|
| Courtesy Pay Overdraft Check | $30 |
| Courtesy Pay Overdraft POS (per item) | $10 |
| Courtesy Pay Overdraft ACH | $30 |
| NSF/Return item (per item) | $30 |

(Operative Fee Schedule.) "Item" means a single electronic transaction.  A "re-presentment" or

a "retry" of the same "item" does not change it into a new or different "item."  It is still the same

"item" being presented by the same merchant in the same dollar amount, not a new "item."  An

electronic "item" reprocessed after an initial return for insufficient funds, especially through no

action by the customer, cannot and does not fairly become a new, unique additional "item" for

additional fee assessment purposes.

28.    A New Fee Schedule in about October 2019 replaced the Operative Fee Schedule

for the class period. As can be seen, it stands in stark contrast to the Operative Fee Schedule:

\*Items returned unpaid (e.g., checks, ACH, bill payments, recurring debits) that are re-presented again for payment will be charged additional insufficient or uncollected funds fees if available funds in your account are still insufficient or uncollected when re-presented.  Please see your Consumer Member Account Agreement for additional information about when fees may be charged and for all other Terms and Conditions governing your accounts.  Business Members should refer to the Business Member Account Agreement and to the Business Account Schedule of Fees for business product fee information.

29.     In the New Fee Schedule, Bethpage now states "items returned unpaid…that are

re-presented again for payment will be charged additional insufficient or uncollected funds fees if available funds in your account are still insufficient or uncollected when re-presented." Bethpage thereby clearly demonstrates it understands it had not been allowed to charge more than one NSF for the same "item" up until then and now for the first time stated as follows:

30.    In contrast to its Account Documents, however, during the class period Bethpage regularly assessed two or more fees on the same item or transaction.

31.    This abusive practice is not universal in the financial services industry.  Indeed, major banks like Chase—the largest consumer bank in the country—do not undertake the practice of charging more than one fee on the same item when it is reprocessed.  Instead, Chase charges one fee, even if a transaction is reprocessed for payment multiple times.

32.    Also of note, unlike Defendant, many financial institutions that do engage in this same or similar abusive practice of charging repeat NSF fees for the same item at least identify the balance it is based on, and at a minimum state this fact in their Account Contracts and/or Fee Schedules. They typically use the terminology such as "per presentment" or "per each presentment" to make this clear, similar to what Bethpage added to its Fee Schedule dated October 2019, and often also add far more in explaining this practice to avoid the term being ambiguous.

33.    The following are some examples from other banks and credit unions that make clear what Bethpage was contractually required to do, if it was going to engage in charging multiple $30 NSF fees for the same item.

34.    Air Academy Federal Credit Union contracts for its NSF fee as follows:

"$32.00 **per presentment**."

*See,* https://www.aafcu.com/fees.html (emphasis added) [last visited on or about March 17, 2020].

35.    Central Pacific Bank contracts unambiguously:

Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted**

9

**one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds**.

*See,* https://www.cpb.bank/media/1618/fee-001-rev-10-24-2019-misc-fee-schedule.pdf (emphasis added) [last visited on or about March 17, 2020].

36.     Community Bank, N.A. unambiguously contracts:

**You may be charged more than one Overdraft or NSF Fee if a merchant submits a single transaction multiple times after it has been rejected or returned**.

*See,* https://cbna.com/u/header/2019-Overdraft-and-Unavailable-Funds-Practices-Disclosure-FINAL-1.14.2020.pdf (emphasis added) [last visited on or about March 17, 2020].

37.     Delta Community Credit Union contracts as follows:

"$30 **per presentment**."

*See,* https://www.deltacommunitycu.com/home/fees.aspx (emphasis added) [last visited on or about March 17, 2020]. Further, in its Account Contract, Delta unambiguously states as follows:

The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account. **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected**.

*See,* https://www.deltacommunitycu.com/home/forms/member-savings-services-disclosures-and-agreements.aspx (emphasis added) [last visited on or about March 17, 2020].

38.     First Financial Bank contracts unambiguously:

Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representment). **Each presentment is considered an item and will be charged accordingly**."

*See,* https://www.bankatfirst.com/content/dam/first-financial-bank/eBanking_Disclosure_of_Charges.pdf (emphasis added) [last visited on or about March 17, 2020].

39.     First Hawaiian Bank unambiguously contracts:

10

#11771653.1

> You agree that multiple attempts may be made to submit a returned item for payment and that multiple fees may be charged to you as a result of a returned item and resubmission.

*See,* https://www.fhb.com/en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FH B_Online_Services_RXP1.pdf (emphasis added) [last visited on or about March 17, 2020].

40.    First Northern Credit Union lists its NSF fee as "$22.00 **per each presentment**

**and any subsequent representment(s)**."

*See,* https://www.fncu.org/feeschedule/?scpage=1&scupdated=1&scorder=-click_count (emphasis added) [last visited on or about March 17, 2020.

Further, in its Account Contract, First Northern unambiguously states as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times**.  For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re-present the check for payment again.  If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item.  You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly**, if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees**

*See,* (https://www.fncu.org/SecureAsset.aspx?Path=/7/Member_Agreement_November_1_2019.pdf (emphasis added) [last visited on or about March 17, 2020].

41.    Glendale Federal Credit Union lists its NSF fee as "$30 **per presentment**."

*See,* https://glendalefcu.org/pdf/fees.pdf (emphasis added) [last visited on or about March 17, 2020].

42.    Klein Bank contracts unambiguously:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to

11

pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. **We will charge an NSF/Overdraft Fee** as provided in this section **regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.**

*See,* https://kleinbankonline.com/bridge/disclosures/ib/disclose.html (emphasis added) [last visited on or about March 17, 2020].

43.    Liberty Financial contracts its NSF fee unambiguously as:

"$27.00 **per presentment**."

*See,* https://liberty.financial/about/fee-schedule/  (emphasis added) [last visited on or about March 17, 2020].

44.    Los Angeles Federal Credit Union contracts its NSF fee unambiguously as:

"$29 **per presentment**."

*See,* https://www.lafcu.org/pdf/currentfees_bus.pdf (emphasis added) [last visited on or about March 17, 2020].

45.    Members First Credit Union contracts unambiguously:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once…we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** [.]

*See,*
http://www.membersfirstfl.org/files/mfcufl/1/file/Membership_and_Account_Agreement.pdf
(emphasis added) [last visited on  or about March 17, 2020].

46.    Meriwest Credit Union contracts its fee as:

"$35.00/item **per presentment**".

*See,* https://www.meriwest.com/sites/www.meriwest.com/files/media/consumer_feesched.pdf
(emphasis added) [last visited on or about March 17, 2020].

47.    Partners 1ˢᵗ Federal Credit Union contracts unambiguously:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee**

12

> **for any given item**. Therefore, multiple fees may be charged to
> you as a result of a returned item and resubmission regardless of
> the number of times an item is submitted or resubmitted to us for
> payment, and regardless of whether we pay the item or return,
> reverse, or decline to pay the item.

*See,* https://www.partners1stcu.org/uploads/page/Consumer_Account_Agreement.pdf (emphasis added) [last visited on or about March 17, 2020].

    48.    RBC Bank unambiguously contracts:

> "We may also charge against the Account an NSF fee for each
> item returned or rejected, **including for multiple returns or
> rejections of the same item**."

*See,* https://www.rbcbank.com/siteassets/Uploads/pdfs/Service-Agreement-for-Personal-Accounts.pdf (emphasis added) [last visited on or about March 17, 2020].

    49.    Regions Bank contracts unambiguously:

> If an item is presented for payment on your account at a time when
> there is an insufficient balance of available funds in your account
> to pay the item in full, you agree to pay us our charge for items
> drawn against insufficient or unavailable funds, whether or not we
> pay the item. **If any item is presented again after having
> previously been returned unpaid by us, you agree to pay this
> charge for each time the item is presented for payment and the
> balance of available funds in your account is insufficient to pay
> the item**.

*See,* https://www.regions.com/virtualdocuments/Deposit_Agreement_6_1_2018.pdf (emphasis added) [last visited on or about March 17, 2020].

    50.    Tyndall Federal Credit Union lists its NSF fee as:

> "$28.00 **per presentment** (maximum 5 per day)."

*See,* https://tyndall.org/member_center/document_center/fee_schedule (emphasis added) [last visited on or about March 17, 2020].

    51.    USE Credit Union contracts unambiguously :

> "**Fees are charged per presentment, meaning the same item is
> subject to multiple fees if presented for payment multiple
> times**."

*See,* https://www.usecu.org/home/Files/static/documents/Schedule_of_Fees.pdf (emphasis added) [last visited on or about March 17, 2020].

    52.    Unlike these other financial institutions, Bethpage did no such thing until October

2019 with the New Fee Schedule.  If Bethpage wanted to engage in this abusive practice, it was

#11771653.1

at least required to state and contract so, as these other financial institutions all do.  All of these quotations show that banks and credit unions know how to make a contract if they want to charge more than one fee for the same "item," and they differentiate between an "item" and the "repeat presentment of the item" when calculating NSF fees.  Bethpage's change to its own contracts with the October 2019 New Fee Schedule shows that Bethpage understands that its prior contracts did not allow it to charge multiple NSF fees for the same item.  Only with the New Fee Schedule dated October 2019 does Bethpage for the first time state that it will assess an NSF fee each time the same item is "re-presented."

53.    Bethpage's practice of charging multiple NSF fees for a single electronic transaction is particularly egregious because, as described, Bethpage assesses such fees using an improper calculation of the balance available in a member's account.  On information and belief, Bethpage therefore often charges an overdraft or NSF fee improperly, and that improper $30 deduction from a member's balance further decreases the "balance," generating even more improper NSF or overdraft fees.

54.    Further, on information and belief, as alleged Bethpage also charged fees which it had no contractual right to charge, fees which were not authorized or even mentioned by the Operative Account Contract or the Operative Fee Schedule, fees such as  "Uncollected Funds Charge External Withdrawal (Paid)";  "Uncollected Funds Charge External Withdrawal (Returned)", "Insufficient Funds Charge External Withdrawal (Paid)"; "Insufficient Funds Charge External Withdrawal (Returned)"; "Insufficient Funds Charge CK (Paid)"; "Insufficient Funds Charge CK (Returned)"; "Overdraw Protection Withdraw"; and, "POS Courtesy Pay Usage Fees" fees.  Plaintiff was charged at least the following such fees: an "Uncollected Funds Charge External Withdrawal (Returned)", which Defendant charged Plaintiff at least on April 15,

14

2019, in the amount of $30; an "Insufficient Funds Charge External Withdrawal (Returned)",

which Defendant charged Plaintiff at least on April 18, 2019, in the amount of $30; and, an

"Insufficient Funds Charge CK (Returned)", which Defendant charged Plaintiff at least on April

7, 2019, in the amount of $30.

55.    12 C.F.R. § 707.3(a) requires that a credit union like Bethpage set forth fees,

"…clearly and conspicuously, in writing, and in a form the member or potential member may

keep."  Furthermore, 12 C.F.R. Appendix C to Part 707 - Official Staff Interpretations, is the

means by which the staff of the Office of General Counsel of the National Credit Union

Administration issues official staff interpretations of Part 707 of the NCUA Rules.  Regarding

the Official Staff Interpretation pertaining to this requirement about disclosure of fees, the

Official Staff Interpretation requires that the terminology regarding the fees also must be

consistent: "3. Consistent terminology. A credit union must use the same terminology to describe

terms or features that are required to be disclosed. For example, if a credit union describes a

monthly fee (regardless of account activity), as a "monthly service fee" in account opening

disclosures, the periodic statements and change-in-terms notices must use the same terminology

so that members and potential members can readily identify the fee."  12 C.F.R. Appendix C to

Part 707, 707.3(a)3.  Furthermore, these Official Staff Interpretations also require that these,

"Disclosures must be presented in a format that allows members and potential members to

readily understand the terms of their account." 12 C.F.R. Appendix C to Part 707, 707.3(a) 2.

The descriptions used by Bethpage not only do not even remotely comply with these

requirements, but are next to impossible to understand by any reasonable person, and were made

even more confusing because they were imposed based on a balance in the account not described

by Bethpage as the one which would be used to assess fees.

15

#11771653.1

56.     To the extent Bethpage attempts to argue an "Insufficient Funds Charge External Withdrawal (Returned)" fee is supposed to mean under the "Operative Fee Schedule" an NSF Fee, not only is the terminology different and inconsistent, and not "clear," but Bethpage also does not state any such fees would be charged for ACH items, only, arguably, for checks. Further, the Operative Fee Schedule states the charge would be "per item" and not "per each presentment of the item."

57.     To the extent that charging an "Insufficient Funds Charge External Withdrawal (Returned)" fee was permitted at all before the New Fee Schedule became effective, it certainly was not permitted to be charged more than once for the same "item."  Yet Plaintiff was charged such a fee more than once for the same item numerous times, including but not limited to on March 23 and March 28, 2019, for the same item; on March 28 and March 30, 2019, for the same item; on April 15, 2019, and April 22, 2019, for the same item; on May 17, 2019, and May 19, 2019, for the same item; and, on May 24, 2019, and May 27, 2019, for the same item.

58.     With regard to the improper "OD Protection Tran Fee" Fee, Bethpage supposedly charged this fee to prevent a negative balance which would lead to an overdraft or NSF fee from occurring by transferring money from a member's savings account to the checking account. However, on information and belief, Bethpage would transfer such money from the savings account to the checking account, and charge the $5 fee, even when the balance in the checking account was not negative.  Defendant did this to Plaintiff at least on April 9, 2019, April 17, 2019, and May 7, 2019, and each time Defendant charged Plaintiff $5 for transferring the money from the savings account to the checking account even though the checking account was not in a negative balance.

59.     On information and belief, the above examples of improper fees on the same item,

and fees which were charged but were not contracted for, or were charged in breach of contract, are just a few examples, and Plaintiff believes that Defendant's database will reveal numerous other and different examples of the improper charging of such fees by Defendant. A review of Defendant's database will be required to determine all such fees.

60.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts. Plaintiff did not and could not have, exercising reasonable diligence, discovered both that she had been injured and the actual cause of that injury until she met with her attorneys in or about October 2020.  While Plaintiff understood that she was assessed fees, she did not understand the cause of those fees until about October 2020 because Defendant hid its actual practice from its members by describing a different practice in its contracts. It also mis-labeled fees, did not describe them "clearly and conspicuously", and used terminology inconsistently,  making it next to impossible for a reasonable person to understand which fees applied to which transactions or were authorized.  This not only reasonably delayed discovery, but Defendant's affirmative representations and actions also equitably toll any statute of limitations, and also additionally equitably estop Defendant.

61.    Moreover, the assessment and unilateral taking of improper overdraft or NSF fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which Bethpage assesses further overdraft or NSF fees.  This practice was deemed to be deceptive and substantially harmful to customers by the CFPB, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation

17

methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)

62.     Plaintiff and class members were harmed by these practices when they were assessed such fees when they should not have been.  A complete evaluation of Bethpage's records is necessary to determine the full extent of Plaintiff's harm from this practice.

## CLASS ACTION ALLEGATIONS

63.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

64.     Plaintiff bring this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following classes.

**Class One:**

**Class One: The Repeat NSF Class:**

> **All United States residents who  had accounts with Bethpage who incurred an NSF fee more than once, or an NSF Fee followed by an overdraft fee, for the same item during the period beginning six years preceding the filing of this Complaint and ending one day before the effective date of the October**

18

2019 New Fee Schedule, who stopped being members of Bethpage before the effective date of the purported arbitration clause that Bethpage claims to have disseminated to members on or about September 30, 2019.

**Class Two: The Unauthorized Fees Class:**

All United States residents who had accounts with Bethpage who incurred an "Uncollected Funds Charge External Withdrawal (Paid)", an "Uncollected Funds Charge External Withdrawal (Returned)"; an "Uncollected Funds Charge CK (Paid)"; an "Insufficient Funds Charge External Withdrawal (Paid)"; an "Insufficient Funds Charge External Withdrawal (Returned)" ; an "Insufficient Funds Charge CK (Paid)"; or an "Insufficient Funds Charge CK (Returned)" during the period beginning six years preceding the filing of this Complaint and ending one day before the effective date of the October 2019 New Fee Schedule, who stopped being members of Bethpage before the effective date of the purported arbitration clause that Bethpage claims to have disseminated to members on or about September 30, 2019.

**Class Three: The Improper "Overdraw Protection Withdraw" Fee Class:**

All United States residents who had accounts with Bethpage who incurred an "Overdraw Protection Fee" when the balance in the checking account was not negative beginning six years preceding the filing of this Complaint and ending on the effective date of the purported arbitration clause that Bethpage claims to have disseminated to members on or about September 30, 2019.

65.    Excluded from the Classes are: (a) any entity in which Defendant has a controlling interest; (b) officers or directors of Defendant; (c) this Court and any of its employees assigned to work on the case; and (d) all employees of the law firms representing Plaintiff and

the Class Members.

66.    This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Federal Rule of Civil Procedure 23.

67.    **Numerosity** – The members of the Class are so numerous that a joinder of all members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believe that the Classes are likely to include thousands of members based on the fact that Bethpage has approximately $9.2 billion in assets and has over 405,000 members.

68.    Upon information and belief, Defendants have databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Bethpage's members have been harmed by its practices and thus qualify as Class Members.  Further, the Class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice by mail or email, alternatively proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

69.    **Commonality –** This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

   a.    Whether, pursuant to the Operative Account Contract, Defendant contracted that it would charge more than one NSF fee for the same item each time that same item was re-presented;

20

b.      Whether the Operative Account Contract was ambiguous on the issue of whether Defendant contracted that it would charge more than one NSF fee for the same item each time that same item was re-presented;

c.      Whether, pursuant to the Operative Fee Schedule, Defendant contracted it would charge more than one NSF for the same item, charging an NSF each time the same item was re-presented, or whether this was unambiguously presented for the first time only in the October 2019 New Fee Schedule;

d.      Whether, pursuant to the Operative Fee Schedule, Defendant contracted it would charge for the fees it assessed despite the fees not being listed;

e.      Whether Defendant charged to transfer money from savings to checking when the balance in the checking account was not negative;

f.      Whether the contracts are ambiguous on what fees will be charged under what circumstances;

70.    **<u>Typicality</u>** – Plaintiff's claims are typical of all members of the Class. The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Operative Account Contract and Operative Fee Schedule, were identical as to all relevant terms, and also because, *inter alia*, the challenged practices of charging customers for overdraft fees or NSF fees when there were sufficient funds in the accounts to pay for the transactions at issue, and of assessing multiple NSF fees for the same electronic item, and charging fees not authorized, are uniform for Plaintiff and all Class Members. Accordingly, in pursuing her own self-interest in litigating her

21

claims, Plaintiff will also serve the interests of the other Class Members.

71.     **Adequacy** – Plaintiff will fairly and adequately protect the interests of the Class
Members. Plaintiff has retained competent counsel experienced in class action litigation to
ensure such protection.  There are no material conflicts between the claims of the representative
Plaintiff and the members of the Class that would make class certification inappropriate.
Plaintiff and her counsel intend to prosecute this action vigorously.

72.     **Predominance and Superiority** – The matter is properly maintained as a class
action under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law or
fact identified herein and to be identified through discovery predominate over questions that may
affect only individual Class Members.  Further, the class action is superior to all other available
methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by
the individual Class Members are relatively small, the expense and burden of individual
litigation would make it virtually impossible for Plaintiff and Class Members to individually
seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of
Class Members could afford individual litigation, it would be unduly burdensome to the courts in
which the individual litigation would proceed.  The class action device is preferable to individual
litigation because it provides the benefits of unitary adjudication, economies of scale, and
comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by
individual Class Members would create a risk of inconsistent or varying adjudications with
respect to individual Class Members that would establish incompatible standards of conduct for
the party (or parties) opposing the Class and would lead to repetitious trials of the numerous
common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in
the management of this litigation that would preclude its maintenance as a class action.  As a

22

result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

73.    Plaintiff does not believe that any other Class Members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because both Defendant resides in this District. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

74.    Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

75.    This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that:

    a.  Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

        1.  Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

#11771653.1

2. Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

b. Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

1. The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2. The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. The difficulties likely to be encountered in the management of a class action.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

76.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

24

#11771653.1

77.     Plaintiff and each of the Class Members entered into the Operative Account Contract and Operative Fee Schedule with Defendant covering the subject of fees related to class members' checking accounts. These contracts were drafted by and are binding upon Defendant.

78.     Nowhere did the contracts state that Bethpage would assess an additional NSF fee every time the same electronic item was re-presented for processing or submitted as a "re-try." Bethpage wrongfully treated a "re-try" as a new and separate "item" in violation of the terms of the contracts, and also contradicted its own Operative Fee Schedule which stated the fee would be "per item" not "per each presentment of an item."  Further, the operative contracts governed which fees could be charged and under which circumstances, and Bethpage breached these contracts by charging fees not permitted by the contracts.

79.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

80.     Defendant breached the express and implied terms of the contracts and Operative Fee Schedule by, *inter alia*, charging improper fees.

81.     As a proximate result of Defendant's breaches of contracts, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

**SECOND CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

82.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

83.     Plaintiff and each of the Class Members entered into contracts with Defendant

25

#11771653.1

covering the subject of overdraft and NSF transactions and other checking account related fees transactions, which have been identified herein, as well as the Operative Fee Schedule. The contracts were drafted by and are binding upon Defendant.

84.    In the documents, Bethpage promised that it would only assess "a fee" (singular) when it determined a member did not have enough money in his or her account to cover an "item," not multiple NSF "fee**s**" for the same "item." Defendant also promised that it would not charge fees in a manner different than specified in these documents, or charge other additional fees for which there was no contract to charge. Defendant also did not comply with its sweep from savings to checking in a good faith manner.  Instead it engaged these practices to maximize its fees to the detriment of its members, when it easily could have programmed its software instead not to do this.

85.    Good faith is an element of every contract.  Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

86.    The material terms of the contracts therefore included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

26

87.     Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

88.     Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple NSF fees for the same electronic item, and of charging fees in addition to those contracted for and in a manner not contracted for which increased the fees it charged. Defendant could easily have avoided acting in this manner by simply changing the programing in its software to charge only an NSF "per item" as its own Fee Schedule stated it would do, and to charge other fees correctly in accordance with its contracts as well.  Instead, Defendant unilaterally elected to and did program its software to create accounting gimmicks which would maximize its overdraft and NSF and other fees.  In so doing, and in implementing its checking fees programs for the purpose of increasing and maximizing overdraft fees, Defendant executed its contractual obligations in bad faith, depriving Plaintiff and the Class Members of the full benefit of the contracts.

89.     As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment/Restitution)

90.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

91.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

#11771653.1

92.     Because Plaintiff and the Class Members paid the erroneous fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of these benefits, as well as the wrongful circumstances under which the moneys were conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## FOURTH CAUSE OF ACTION
### (Money Had and Received)

93.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

94.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

95.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## SIXTH CAUSE OF ACTION
### (Violations of New York General Business Law § 349)

96.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein. By the actions alleged above, Defendant has engaged in deceptive acts or practices against Plaintiff and the Class members in violation of New York General Business Law § 349.  The practices were deceptive because, *inter alia*, Defendant engaged in a deceptive

28

act or practice when it charged fees for items which it had no authority to charge, which either were not described "clearly and conspicuously" or with "consistent terminology", or even were not set forth at all in either the Operative Fee Schedule or The Operative Account Contract, or which used labels and terminology which were inconsistent and confusing. Defendant also engaged in a deceptive act or practice because it had a program by which it transferred money from its members' savings accounts into the members' checking accounts to prevent an overdraft or NSF fee from occurring if the checking account does not have enough money in it to cover the transaction. However, Defendant would transfer the money from the savings account to the checking account and charge a fee for the transfer even when there was no possible negative balance. By operating a program for consideration of transferring money from the savings account into the checking account so as to avoid fees which would otherwise result from a negative balance, but then charging the fees despite not needing the transfer to avoid a negative balance, Defendant cost class members damages in the form of fees which should not have been charged. Defendant also engaged in a deceptive act or practice because it would charge more than one NSF fee on the same item. Not only would it cost Defendant nothing to reject an item, and impose a fee for doing so, but Defendant then would subsequently reject the same item again although it had not been requested by a member to be processed again, and Defendant then would charge an additional fee for that same item if it was rejected again. This practice was materially deceptive as a consumer does not expect to be charged a fee more than once for the same rejected item. Plaintiffs suffered harm from these practices when they were assessed wrongful fees.

97.     Under General Business Law § 349(h), Plaintiff and the Class are entitled to damages and other relief in a form and amount to be determined by a court of law.

## EIGHTH CAUSE OF ACTION

### (Negligence)

98.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

99.    In the alternative, to the extent that all or any of above-described conduct was not intentional or contractual, it was negligent and below the standard of care and a dereliction of duties for the directors and officers of Bethpage to establish and implement, or allow to be established and implemented, an overdraft fee or NSF fee program which, *inter alia*, deviated from the terms of its contracts and fee schedules with its members, or which charged fees which were not contracted to be charged at all, or were charged in breach of the contracts.

100.    As a result of such negligence, Plaintiffs and class members were substantially damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.    For an order certifying this action as a class action;

2.    For compensatory damages on all applicable claims and in an amount to be proven at trial;

3.    For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4.    For statutory damages;

5.    For treble damages;

6.    For an order enjoining the wrongful conduct alleged herein;

7.    For costs;

#11771653.1

8.      For pre-judgment and post-judgment interest as provided by law;

9.      For attorneys' fees pursuant to the common fund doctrine, and all other applicable law; and

10.     For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: October 22, 2020                     Respectfully submitted,

                                            WILENTZ, GOLDMAN & SPITZER, P.A.

                                            By____*Kevin P. Roddy*_____
                                                  KEVIN P. RODDY – NYSBA # 652585
                                            90 Woodbridge Center Drive, Suite 900
                                            Woodbridge, NJ  07095
                                            Telephone:  (732) 636-8000
                                            Facsimile:  (732) 726-6686
                                            E-mail:  kroddy@wilentz.com

                                            Taras Kick, CA Bar No. 143379*
                                            Jeffrey Bils, CA Bar No. 301629*
                                            THE KICK LAW FIRM, APC
                                            815 Moraga Drive
                                            Los Angeles, California 90049
                                            Telephone: (310) 395-2988
                                            Facsimile: (310) 395-2088
                                            E-mail:  taras@kicklawfirm.com
                                                       jeff@kicklawfirm.com

                                            *Pro Hac Vice* applications to be submitted

                                            **Attorneys for Plaintiff Annamaria Restrepo and
                                            the Members of the Class**

#11771653.1